IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. GERDES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

PHILIP P. GERDES, APPELLANT.

Filed August 9, 2022.    No. A-21-953.

Appeal from the District Court for Nemaha County: JULIE D. SMITH, Judge. Affirmed.

Emily A. Sisco, of Donahue & Faesser, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Philip P. Gerdes appeals from his convictions on one count of visual depiction of sexually explicit conduct under Neb. Rev. Stat. § 28-813.01(1) (Reissue 2016) and five counts of child abuse under Neb. Rev. Stat. § 28-707(1)(a) (Reissue 2016). Following a bench trial, the district court for Nemaha County found Gerdes guilty of the above six counts and sentenced Gerdes to an aggregate sentence of 24 to 56 months of incarceration. Gerdes appeals, challenging the sufficiency of the evidence on each count and alleging ineffective assistance of trial counsel in two respects. For the reasons that follow, we affirm.

## BACKGROUND

The charges against Gerdes pertain to his conduct and relationship with respect to his stepdaughter, whom we will refer to as the victim throughout this opinion. The record reflects that Gerdes became the victim's stepfather when she was 2 years old. The victim's natural father was

- 1 -

not involved in her life, and for all intents and purposes, Gerdes stepped in to fill that role. By all accounts, Gerdes and the victim had a more or less normal father/daughter relationship until the victim reached adolescence and began going through puberty. According to the victim, around the time she reached middle school, between 2013 and 2015, "Everything got a lot more sexual around the house." The victim testified that Gerdes' sexualized behavior toward her continued from that time until 2019 when the victim went to live with her grandparents in a different city. Certain specific instances of that behavior ultimately led to the convictions from which Gerdes now appeals.

On December 6, 2019, the State filed a complaint against Gerdes in the county court for Nemaha County, alleging eight counts of criminal conduct. Count I alleged that on or about December 2018 to February 2019, Gerdes knowingly possessed a visual depiction of sexually explicit conduct containing the victim. Counts II through VIII each alleged separate instances of child abuse in that on or about the specified date, Gerdes knowingly or intentionally caused the victim to be placed in a situation that endangered her physical or mental health. Following a preliminary hearing on January 7, 2020, the county court found probable cause to support the charges in the complaint, and the case was bound over to the district court. On January 21, the State filed an information in the district court for Nemaha County which mirrored the criminal complaint previously filed. After a number of pretrial hearings which are not at issue in this appeal, on July 14, 2021, Gerdes appeared before the district court and waived his right to a jury trial. The case proceeded to a bench trial which took place on August 2 and 3, 2021, with closing arguments reserved until the morning of August 4.

The evidence at trial revealed that on May 18, 2019, Gerdes' wife, the victim's natural mother, contacted Deputy Bryan Adams of the Nemaha County sheriff's office regarding concerns related to Gerdes' relationship with the victim. In response, Adams arranged for the victim to be interviewed by the Family Advocacy Network with the assistance of Kara Hutchison, an investigator for the Nebraska State Patrol. Hutchison testified that in her position with the Nebraska State Patrol she had approximately 4 years of experience overseeing forensic interviews of children conducted by the Family Advocacy Network. Hutchison testified that she oversaw a forensic interview with the victim on May 22, 2019.

Hutchison testified that the interview revealed information about a number of concerning incidents between Gerdes and the victim. The victim disclosed specific events that occurred on or about Father's Day weekend 2018 and Easter 2019, as well as various circumstances in which the victim was made to be nude while in Gerdes' presence. Hutchison testified that the victim appeared to be afraid of Gerdes. The victim testified at trial to elaborate on the incidents revealed during that interview.

The victim described how Gerdes would direct her to take her bra off as soon as she got home and that she was not allowed to wear a bra in the house and that Gerdes would "very frequently" observe her while she was naked. This testimony was corroborated by text messages from Gerdes to the victim directing her to take her bra off when she gets home and inquiring as to whether she planned to wear a bra or not. The victim also indicated that Gerdes would come into the bathroom while she was showering, open the curtain, and view the victim naked while he spoke casually to her about her chores or his plans for the day. Moreover, the criminal investigation

revealed a video in Gerdes' possession which depicts the victim preparing for and then taking a shower.

Adams testified that he seized Gerdes' computer and sent it to the Nebraska State Patrol crime lab to be analyzed. Trooper Eric Aho, a computer forensic examiner for the Nebraska State Patrol, testified that he received Gerdes' computer from Adams and attempted to "image" the computer. Aho testified that "imaging" a computer results in a "bit-for-bit copy" of anything loaded on the computer's drive. However, Aho did not have the proper software to image the computer, so he requested assistance from Sergeant John Donahue of the Lincoln Police Department. Donahue was able to image Gerdes' computer with the proper software, and the video in question was discovered on the computer under Gerdes' profile.

Upon further investigation, it was revealed that the video was originally recorded in September 2018 using Gerdes' cell phone and then backed up onto the computer when Gerdes obtained a new cell phone a few months later. The video appears to have been obtained through deception, and the victim testified she was not aware of the video until much later. The victim testified that the bathroom floor was regularly littered with clothes and garbage, as illustrated in exhibits 27 and 28. The victim testified that Gerdes must have hidden his phone amongst the mess in order to record the video. Gerdes' possession of the video in question was the basis for the allegations in count I of the information.

The victim described how, during the summer of 2017, she obtained tan lines from her track uniform, and Gerdes told her that "he didn't like [her] tan lines." According to the victim, Gerdes directed her to "sunbathe naked" to get rid of the tan lines and then viewed the victim as she was sunbathing. The victim testified generally about at least two instances of Gerdes directing her to sunbathe naked in June and July 2017 respectively, however, she indicated that in only one of those instances did Gerdes actually observe her naked. These two instances of the victim sunbathing naked during the summer of 2017 were the basis for the child abuse allegations in counts II and III of the information.

The victim described how Gerdes routinely measured her bare breasts for the purpose of getting a more "accurate reading" than the measurements taken by employees at Victoria's Secret. When asked how often Gerdes measured her breasts, the victim stated, "Depends if we could find a tape measurer [sic]. It could be anywhere from once to, like, three or four times a month." The victim testified that Gerdes measured her breasts more than 20 times when she was between the ages of 15 and 17, and she testified to at least one particular incident which occurred around April or May 2018. The victim indicated that this behavior always made her uncomfortable and caused her to be visibly upset to the point of crying. However, she testified that she did not know how to stop it, and it was the only way she could obtain bras. The particular incident of Gerdes measuring the victim's bare breasts around April or May 2018 was the basis for the child abuse allegations in count IV of the information.

With respect to the events on Father's Day weekend 2018, the victim testified that she and Gerdes were drinking alcohol together at the home of Gerdes' friend, Scott Sohnholz, when they all started playing a game of truth or dare. At one point, Gerdes dared the victim "[t]o walk around the truck with no pants on." The victim apparently complied with that dare, however, the victim testified that the game ended abruptly when Gerdes dared her to masturbate in the back of the truck and she refused. According to the victim, Gerdes was upset that she refused the dare, and Sohnholz

had to intervene to "calm [Gerdes] down." The victim's testimony is corroborated by Sohnholz' testimony to the extent that Gerdes dared the victim to masturbate, she refused, the incident caused her to "tear up," and Sohnholz had to intervene by telling Gerdes to "leave [the victim] alone." The truth or dare incident over Father's Day weekend was the basis for the child abuse allegations in count V of the information.

The victim described how Gerdes directed her to sleep without a bra, and, on at least one occasion on or about July 2018, Gerdes directed her to sleep with him in his bed while the victim's mother was out of town. The victim indicated that she attempted to refuse to sleep in Gerdes' bed, but she recalled that "[h]is voice changed and told me I didn't have an option." The victim testified that she cried herself to sleep that night. The incident of Gerdes directing the victim to sleep in his bed without a bra was the basis for the child abuse allegations in count VI of the information.

The victim described an incident in November 2017, in which Gerdes and the victim went to get groceries and alcohol, and, on the way back home, Gerdes pulled over to apply "breast enhancement cream" to the victim's bare breasts. According to the victim, Gerdes told her that he was going to apply the cream because "he didn't like that [her] breasts weren't developing." The victim testified that Gerdes had purchased alcohol for her, and that she was drinking alcohol at the time of the incident. This incident was the basis for the child abuse allegations in count VII of the information.

With respect to the events of Easter 2019, the victim testified that she was trying to sleep when Gerdes came into her room twice between midnight and 1 a.m. The first time Gerdes came in, he was fully clothed and asked the victim if she wanted to "go drinking," and the victim refused. The second time Gerdes came in, he was fully nude. According to the victim, Gerdes sat down on her bed and asked if she "wanted to even the score." The victim testified that she did not know what Gerdes meant by that, but she was scared. The victim told Gerdes no, and he left, however, when she woke up in the morning, the victim found Gerdes, still fully nude, sitting in a chair in the living room. The victim testified that she was afraid of Gerdes and attempted to avoid him as much as possible following this incident. The incident around Easter 2019 was the basis for the child abuse allegations in count VIII of the information. Overall, the victim testified that Gerdes' behavior toward her was hurtful and distressing. She further testified that the foregoing events ultimately led her to engage in self-harm and attempt suicide while she was living with Gerdes.

Gerdes testified on his own behalf and wholly denied some of the allegations in the information. For example, Gerdes denied that he ever made the victim sleep with him in his bed. Gerdes denied that he ever applied breast cream to the victim. Gerdes denied the events of Easter 2019 where he reportedly went into the victim's room while naked and made a suggestive remark. Finally, Gerdes denied any involvement with the video of the victim showering. With respect to the latter, Gerdes indicated that he did not even know how to record a video with his cell phone, and he suggested that someone else must have recorded the video using his phone. The State sought to impeach that testimony with evidence of a cell phone video that Gerdes recorded prior to September 2018. Gerdes' explanation for the earlier video was that he "got lucky once." With respect to the remaining allegations, Gerdes admitted that the events occurred, but he explained them away as innocent misunderstandings.

For example, Gerdes admitted that he suggested to the victim to sunbathe naked as one "option" to get rid of her tan lines, but he denied that he "directed" or "forced" her to do so. Gerdes

admitted that he briefly observed her one time while she was sunbathing naked, but he explained that he quickly turned his gaze and then informed the victim's mother what happened. Gerdes admitted that he did measure the victim's bare breasts, but he testified that he only did so because the victim would "hound" him about it. Gerdes further testified that the measuring only occurred once a year. Gerdes admitted that he would tell the victim to take her bras off at home, but he explained his purpose was to suggest that her bras "might last longer" if she did not wear them at home. Finally, Gerdes admitted that he dared the victim to masturbate, but he testified that he only did so because he did not think that she would do it and he wanted the game to end.

After closing arguments, the court entered its ruling from the bench. The court made preliminary findings that the State had proven the victim was a minor with respect to each count, and that all the pertinent events took place in Nemaha County. The court also made explicit findings with regard to the credibility of the witnesses. Particularly as it relates to the conflicts between the testimony provided by Gerdes and the victim, the court found the victim's testimony more credible. The court found that the victim was "able to communicate accurately" and her testimony was "reasonable." In contrast, the court found Gerdes' testimony to be unreasonable in many respects. The court indicated that much of Gerdes' testimony was illogical and "farfetched." The court further noted that the victim's testimony was corroborated by the evidence, whereas, some of Gerdes' testimony was impeached.

The court addressed each count individually, however, the court started with counts II and III, reserving its ruling on count I for last. With respect to counts II and III, which pertained to separate instances of Gerdes allegedly viewing the victim while she was sunbathing naked, the court found Gerdes not guilty. The court observed that the evidence indicated Gerdes viewed the victim naked on one occasion, but that the State failed to prove whether that occasion was consistent with either charge. Thus, the court found Gerdes not guilty on both counts II and III. With respect to counts IV through VIII, the court found Gerdes guilty beyond a reasonable doubt.

With respect to count I, which pertained to the video of the victim in the shower, the court found Gerdes guilty beyond a reasonable doubt. The court found that the video contained erotic nudity and thus qualified as a visual depiction of sexually explicit conduct. In that regard, the court noted that the video clearly depicts the victim's developed breasts and genitals, such that the only question was whether Gerdes possessed the video for the purpose of sexual gratification or stimulation. Pointing to the sexualized behavior underlying the other charges, the court found that Gerdes had clearly "taken a sexual interest in [the victim]." Referencing case law regarding secret recordings made for the purpose of sexual gratification, the court found that Gerdes possessed the video for his own sexual gratification, and thus, the court found him guilty beyond a reasonable doubt on count I. Gerdes appealed.

## ASSIGNMENTS OF ERROR

Gerdes assigns, restated, that the district court erred in finding sufficient evidence to support any of his convictions. Gerdes also raises, through new counsel, two claims of ineffective assistance of trial counsel.

STANDARD OF REVIEW

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022). Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *Id.*

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal; the determining factor is whether the record is sufficient to adequately review the question. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). The record is sufficient to resolve on direct appeal a claim of ineffective assistance of counsel if the record affirmatively proves or rebuts either deficiency or prejudice with respect to the defendant's claims. *Id.*

ANALYSIS

*Sufficiency of the Evidence.*

Gerdes argues that the evidence was insufficient to convict him on count I, which charged Gerdes with knowingly possessing a visual depiction of sexually explicit conduct which portrays the victim. The ultimate question on appeal is whether the video contains "erotic nudity" and thus amounts to a depiction of sexually explicit conduct.

Neb. Rev. Stat. § 28-1463.02(5) (Reissue 2016) defines "sexually explicit conduct" to include "erotic nudity." Section 28-1463.02(3) defines erotic nudity as "the display of the human male or female genitals or pubic area, the human female breasts, or the developing breast area of the human female child, for the purpose of real or simulated overt sexual gratification or sexual stimulation of one or more of the persons involved." To show "erotic nudity" as defined in § 28-1463.02, the State must prove first, that the depiction displayed a human's genitals or a human's pubic area or female's breast area, and second, that the depiction was created for the purpose of real or simulated overt sexual gratification or sexual stimulation. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). In *Smith*, the Nebraska Supreme Court adopted the following nonexclusive list of six factors to determine whether a visual depiction was created for the purpose of real or simulated overt sexual gratification or sexual stimulation:

(1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

(2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

(3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

(4) whether the child is fully or partially clothed, or nude;

(5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

(6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* at 460, 873 N.W.2d at 193. The court clarified that a visual depiction need not involve all of the factors to be considered "erotic nudity." *Id.* Moreover, the court noted that the sexual nature of a visual depiction "is not determined solely from the subject of the photograph, but also from the motives of the persons generating it." *Id.* at 460-61, 873 N.W.2d at 193-94.

In the present case, Gerdes does not challenge the court's finding that he knowingly possessed the video. Furthermore, Gerdes concedes that the video displayed the victim's developed breasts and genitals. Rather, Gerdes' sole argument is that the State failed to prove the video was created for the purpose of sexual gratification or stimulation. Specifically, Gerdes argues that the State failed to offer any evidence to satisfy any one of the factors in *Smith*. Gerdes also asserts the court's finding that Gerdes had taken a sexual interest in the victim was not a factor listed in *Smith*, and therefore, cannot satisfy the definition of "erotic nudity." Gerdes' argument is misguided.

First of all, the evidence arguably does implicate the first and fourth *Smith* factors, in that the victim was fully nude and such nudity was the focal point of the video. Although, even if none of the *Smith* factors were present, the court made clear that the six factors are not an exclusive list. Moreover, the court emphasized that "a trier of fact may consider circumstantial evidence of a defendant's intent in determining whether a depiction was created for overt sexual gratification or sexual stimulation." *Id.* at 464-65, 873 N.W.2d at 196. Thus, the evidence that Gerdes had taken a sexual interest in the victim, while not one of the stated factors, was an appropriate consideration to determine whether the video contained erotic nudity. When viewed in the light most favorable to the prosecution, the evidence at trial was sufficient for a rational trier of fact to conclude that the video contained erotic nudity. Thus, we affirm Gerdes' conviction on count I.

Gerdes also argues that the evidence was insufficient to convict him on counts IV through VIII, which each charged Gerdes with child abuse for knowingly or intentionally causing the victim to be placed in a situation that endangered her physical or mental health. Gerdes' sole argument, which he raises generally with respect to all five child abuse convictions, is that the State failed to prove Gerdes "endangered" the victim's physical or mental health.

Under § 28-707(1)(a), a person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be placed in a situation that endangers his or her life or physical or mental health. "Endangers" for purposes of § 28-707(1)(a) means to expose a minor child's life or health to danger or the peril of probable harm or loss. *State v. Ferguson*, 301 Neb. 697, 919 N.W.2d 863 (2018). The purpose of criminalizing conduct under the statute is that where a child is endangered, it may be injured; it is the likelihood of injury against which the statute speaks. *Id.* Criminal endangerment in § 28-707(1)(a) encompasses not only conduct directed at the child but also conduct which present the likelihood of injury due to the child's having been placed in a situation caused by the defendant's conduct. *State v. Ferguson, supra*.

The evidence in the present case, when viewed in the light most favorable to the prosecution, is sufficient to support a finding that Gerdes' conduct endangered the victim. The

victim testified Gerdes' behavior made her feel uncomfortable and caused distress. The victim was afraid of Gerdes, and she described multiple occasions in which Gerdes' conduct brought her to tears. Gerdes' conduct ultimately caused the victim to engage in self-harm and attempt suicide. Under the circumstances of this case, a rational trier of fact could find that Gerdes' conduct endangered the victim's physical or mental health. Accordingly, we affirm Gerdes' convictions on counts IV through VIII.

*Ineffective Assistance of Counsel.*

Gerdes raises two claims of ineffective assistance of counsel. First, Gerdes argues his trial counsel was ineffective for failing to investigate additional text messages which allegedly "could have corroborated [Gerdes'] testimony, and/or rebutted [the victim's] testimony." Brief for appellant at 10. Second, Gerdes argues his trial counsel was ineffective for failing to call multiple unnamed witnesses. We conclude that Gerdes failed to raise either claim with sufficient particularity to preserve the claim for postconviction relief.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). Otherwise, the ineffective assistance of trial counsel issue will be procedurally barred. *Id.* The necessary specificity of allegations of ineffective assistance of trial counsel on direct appeal for purposes of avoiding waiver requires, at a minimum, allegations of deficient performance described with enough particularity for an appellate court to make a determination of whether the claim can be decided upon the trial record and also for a district court later reviewing a potential petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.* Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity. *Id.* A vague or conclusory allegation of deficient performance is insufficient to raise and preserve a claim of ineffective assistance of counsel. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

Both of Gerdes' claims amount to vague and conclusory allegations that there exists some exculpatory evidence which trial counsel failed to utilize. Gerdes fails to describe, with any degree of specificity, the nature of that evidence or how it would have aided in his defense. Gerdes' first claim merely asserts that he was in possession of certain text messages which could have either corroborated his own testimony or rebutted the victim's testimony. There is no indication as to what the text messages said, with whom they were exchanged, or what portions of testimony they might have either corroborated or rebutted. Without more specific allegations as to the purported nature and content of Gerdes' text messages, we have no basis to determine whether that claim can or cannot be resolved on the record. Moreover, a future district court reviewing a possible postconviction claim would be at a loss to determine whether any text messages then identified were the same text messages to which Gerdes now refers.

Gerdes' second claim that trial counsel failed to call "approximately multiple witnesses" is similarly deficient. Brief for appellant at 10. See *State v. Blake, supra.* (vague assertions that counsel was deficient for failing to call witnesses are little more than placeholders and do not

sufficiently preserve claim). Accordingly, we decline to address either of Gerdes' ineffective assistance of counsel claims on the grounds that they were not raised with sufficient particularity.

## CONCLUSION

For the foregoing reasons, we affirm Gerdes' convictions on counts I and IV through VIII, and we decline to address Gerdes' claims of ineffective assistance of counsel.

AFFIRMED.